

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

RECEIVED

JAN 3 0 2001

SAMUEL L. KAY, CLERK
U.S. District & Bankruptcy Courts
Southern District of West Virginia

THE WEST VIRGINIA HIGHLANDS
CONSERVANCY,

**Plaintiff**

v.                                          CIVIL ACTION NO. 2:00-CV-1062

BRUCE BABBITT, et al.,

**Defendants.**

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
## DEFENDANT CASTLE'S MOTION TO DISMISS

### I.  Plaintiff's Claims Against DEP Are Not Barred by the Eleventh Amendment

Defendant Director of the West Virginia Division of Environmental Protection (DEP)

argues that Plaintiff's claims against DEP are barred by the Eleventh Amendment.  DEP contends

that the nondiscretionary duties that Plaintiff seeks to enforce all derive exclusively from State

law, and that the Eleventh Amendment "prohibits a federal court from ordering state officials to

conform their conduct to state law."  DEP Mem. 5.

DEP admits that its argument is directly inconsistent with this Court's decision in Bragg v.

Robertson, Civil No. 2:98-0636, (Oct. 9, 1998, Mem. Op.)(attached as Exhibit 1).  DEP Mem. 6,

n.2.  In that case, this Court rejected the identical Eleventh Amendment arguments that DEP is

raising here.  This Court held that Congress authorized citizens to sue the Director of DEP under

Section 1270(a)(2) of SMCRA to enjoin violations of his nondiscretionary duties under SMCRA,

and that such suits are within the exception to Eleventh Amendment immunity stated in Ex Parte

Young.  Mem. Op. 4-7.  This Court also held that claims of alleged violations of West Virginia's

federally-approved state program under SMCRA arise under federal law.  Id. at 7-9.

12

DEP does not offer any persuasive argument for overruling that decision.  DEP argues that, after OSM approved DEP's alternative bonding system, West Virginia assumed "exclusive jurisdiction" over all surface mining activities within its borders, and all of DEP's duties under its alternative bonding system became duties under purely state law.  DEP Mem. 4.  This argument is based on a fundamental misunderstanding of the language and legislative history of SMCRA, and is inconsistent with Supreme Court and Fourth Circuit precedents.

The plain language of SMCRA requires that DEP adhere to its federally-approved state program.  Under SMCRA, DEP has a federal, statutory, nondiscretionary duty to deny mining permits unless it finds "that all requirements of this chapter <u>and</u> the State . . . program have been complied with."  30 U.S.C. § 1260(b)(emphasis added).  Federal law therefore precludes DEP from issuing mining permits that do not comply with SMCRA and the federally-approved West Virginia state program.

Furthermore, under Section 1253, state programs must meet minimum federal criteria. <u>Hodel v. Virginia Surface Mining & Reclamation Ass'n</u>, 452 U.S. 264, 289 (1984)(SMCRA "prescribes federal minimum standards governing surface coal mining, which a State may either implement itself or else yield to a federally administered program").  As the Ninth Circuit stated about similar federally-approved state programs implementing the federal Resource Conservation and Recovery Act (RCRA), "[t]he federal criteria give the state standards legal effect under federal law."  <u>Ashoff v. City of Ukiah</u>, 130 F.3d 409, 411 (9th Cir. 1997).  Regardless of whether a state elects to follow the federal regulation or enact its own federally-approved state regulation under RCRA, "it is implementing the federal criteria and [that regulation] is therefore effective pursuant to RCRA."  <u>Id</u>.  Similarly, after the federal government determined that the state

2

regulations in West Virginia's state mining program satisfied the minimum federal standards in SMCRA, those regulations became effective and enforceable as federal law.

DEP mistakenly relies on Section 1253(a) of SMCRA, which provides that approved state programs assume "exclusive jurisdiction" over the regulation of surface coal mining in their states. 30 U.S.C. § 1253(a). However, that provision means only that West Virginia has "exclusive jurisdiction" to regulate mining pursuant to SMCRA, and subject to federal oversight and citizen enforcement. That provision does not alter the fact that approved state programs implement federal law. Section 1253(a) does not override 1260(b). Congress used the "exclusive jurisdiction" concept only to tell the regulated industry <u>which</u> program (state or federal) is controlling.[1]

DEP's argument is also directly inconsistent with the legislative history of SMCRA. When it enacted SMCRA in 1977, Congress considered a "states' rights amendment," which proposed that states "may elect to retain exclusive State jurisdiction over the regulation of surface coal mining and reclamation operations taking place on lands within the State by incorporating in State law standards which are equal to or more stringent than the environmental protection performance standards of" SMCRA. 123 Cong. Rec. 15581 (1977), Amendment No. 277, § 429(a). One of the amendment's sponsors, Senator Domenici, described it as a "third way" that

---

[1]This conclusion is directly supported by the 1977 Senate Report, which states that:

> Promulgation of a Federal program gives the Secretary *exclusive jurisdiction* for regulation of surface mining operations in the State in those areas not being adequately enforced by the State. Surface mine operators need to know which regulations–Federal or State–they must follow at any given point in time. [emphasis in original]

S. Rep. No. 128, p. 72.

would allow states "to get their program certified in 24 months as to environmental and reclamation standards and they opt out of this bill and run their own program." Id. at 15584. He described the "first way" as an exclusively federal program that no one "in his right mind will do," and the "second way" as a state program that "basically put[s] in place everything that the Federal Government requires in this bill . . . ." Id.

The Senate rejected this states' rights amendment by a vote of 51 to 39. Id. at 15591. Instead, Congress passed the current version of Section 1253(a), which is not consistent with this amendment, and Section 1260(b), which provides that, as a matter of federal law, mining permits must be consistent with either a federal program or a federally-approved state program. Thus, by rejecting the states' rights amendment, Congress allowed only two alternatives (an exclusively federal program or a federally-approved state program), and rejected the "third way" (an exclusively state program) that DEP now urges upon this Court. This legislative history is fatal to DEP's argument. "Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language." I.N.S. v. Cardoza Fonseca, 480 U.S. 421, 442-43 (1987).

DEP's argument is also inconsistent with Arkansas v. Oklahoma, 503 U.S. 91 (1992). In that case, the Court construed an EPA regulation that requires a water discharge permit issued under the Clean Water Act to comply "with the applicable water quality requirements of all affected States." 40 C.F.R. § 122.4(d). The Supreme Court held that "this regulation effectively incorporates into federal law those state-law standards the Agency reasonably determines to be 'applicable'" and that those state water quality standards "are part of the federal law of water

4

pollution control." Id. at 110.

Similarly, under SMCRA, a state program is incorporated into federal law in three ways. First, Section 1260(b) says that states must comply with their approved state programs. That requirement is analogous to the regulation construed in Arkansas v. Oklahoma.[2] It federalizes state law. Second, Section 1253(b) and 30 C.F.R. § 732.17(g) provide that state programs do not become effective until they are approved by federal rulemaking. There would be no need to go through a federal rulemaking if those provisions were purely state law. Third, 30 C.F.R. § 900.11 provides that approved state programs are codified in the Code of Federal Regulations. There would be no need to do this if federally-approved programs were considered to be purely state law. Consequently, "where, as here, federal law incorporates by reference requirements established by state law, the federal supremacy rationale under Ex Parte Young applies with equal force." Geis v. Board of Education, 774 F.2d 575, 581 (3rd Cir. 1985)(quoting Everett v. Schramm, 772 F.2d 1114, 1119 (3rd Cir. 1985).

DEP's argument is also inconsistent with Molinary v. Powell Mountain Coal Co., Inc., 125 F.3d 231, 235-37 (4th Cir. 1997). In that case, the Fourth Circuit held that state regulations in Virginia's federally approved State program under SMCRA were "issued pursuant to" SMCRA and therefore are federally enforceable. It makes no difference that Molinary was a citizen suit against a mine operator, while this case is a citizen suit against a state official. If a State program is federal law for mine operators, it must also be federal law for the state agency that regulates mine operators. The same state program cannot be state law for the state agency and federal law

---

[2]Both state mining programs and state water quality standards require federal approval. EPA has a mandatory duty to review state water quality standards under 33 U.S.C. § 1313(c). Miccosukee Tribe of Indians v. United States, 105 F.3d 599, 601 (11th Cir. 1997).

for the mining company.

Because West Virginia's federally-approving mining program implements federal law, the Ex Parte Young exception to Eleventh Amendment immunity applies to this case.[3] The Director of DEP is subject to suit in federal court under 1270(a)(2) for failing to follow the mandate of federal law.[4]

## II. Plaintiff's Claims Arise Under 30 U.S.C. § 1270(a)(2)

In a variation of its first argument, DEP argues that the duties that Plaintiff is seeking to enforce in Counts 4, 5, and 7 are not federal duties found "under this chapter," as 30 U.S.C. § 1270(a)(2) requires, but instead are duties found only under state statutes and regulations governing bonding. DEP Mem. 6-8. However, Counts 4, 5 and 7 seek to enforce duties under federal statutes and regulations applicable to federally-approved state programs. As we have explained in Part I above, states with approved programs do not opt out of federal law, and instead have a continuing duty to ensure that their programs comply with SMCRA.

DEP also argues that Section 1270(a)(2) requires a statutory basis for enforceable duties,

---

[3]Alternatively, even if Ex Parte Young were inapplicable, West Virginia waived its immunity by accepting the federal government's invitation to act as the deputized federal regulator of surface mining in that state. States waive their Eleventh Amendment immunity when they choose to "participate in the federal regulatory function delegated to them by the federal government on the condition that their participation be reviewable in federal court." MCI Telecom. Corp. v. Illinois Bell Telephone Co., 222 F.3d 323, 341 (7th Cir. 2000); MCI Telecommunications Corp. v. Public Serv. Comm'n, 216 F.3d 929, 938-39 (10th Cir. 2000); contra, GTE North, Inc. v. Strand, 209 F.3d 909, 922 n.6 (6th Cir. 2000). By choosing to submit a state program for federal approval, West Virginia accepted the federal government's invitation to act as regulator of surface coal mining in that state. In exchange, Congress required West Virginia to agree to submit to federal jurisdiction under § 1270(a)(2) to review its non-discretionary actions for conformity with federal law.

[4]For these reasons, Plaintiff submits that Pennsylvania Federation of Sportsman's Clubs v. Seif (cited at DEP Mem. 6, n.2) is wrongly decided.

6

and does not authorize citizens to enforce duties in federal regulations promulgated under SMCRA. Id. However, the regulatory duties that Plaintiffs seek to enforce in Counts 4, 5, and 7 arise "under this chapter." The words "this chapter" refer to the entire Act. SOCM v. Lujan, 963 F.2d 1541, 1548 (D.C. Cir. 1992). The plain meaning of an act or duty "under" SMCRA is that it refers not only to duties under SMCRA's statutory sections, but also to duties under regulations issued pursuant to SMCRA. One federal district court has held that citizens may use 1270(a)(2) to enforce the Secretary's mandatory duties under SMCRA regulations.[5]

The enforceability of mandatory duties in SMCRA regulations is essential to the statutory scheme. Congress authorized the OSM to issue "such rules and regulations as may be necessary to carry out the purposes and provisions of this Act." 30 U.S.C. § 1211(c)(2). That agency power is "not the power to make law. Rather, it is 'the power to adopt regulations to carry into effect the will of Congress as expressed by the statute.'" Brown & Williamson Tobacco Corp. v. FDA, 153 F.3d 155, 161 (4th Cir. 1998)(citations omitted). Thus, OSM can not issue regulations that create a mandatory duty where none exists in the statute. A regulation can not amend a statute, Koshland v. Helvering, 298 U.S. 441, 447 (1936), or add to a statute "something which is not there." U.S. v. Calamaro, 354 U.S. 351, 359 (1957). Consequently, if a regulation expresses a mandatory duty, it is carrying out the will of Congress as expressed in the statute. Such a regulatory duty therefore arises "under" SMCRA and is enforceable by citizens under 1270(a)(2).[6]

---

[5]SOCM v. Watt, 550 F. Supp. 979, 982 n.2 and 983 (D.D.C. 1982)(nondiscretionary duty under 30 C.F.R. § 723.15(b)), reversed on other grds., 725 F.2d 1424 (D.C. Cir. 1984), rehearing granted, opinion vacated and case remanded, see 963 F.2d 1541, 1545 (D.C. Cir. 1992).

[6]The legislative history supports this conclusion. Congress enacted the citizen suit provision to "assure that regulatory agencies and surface operators comply with the requirements of this Act and approved regulatory programs." S. Rep. No. 128, 95th Cong., 1st Sess. 88 (1977).

### III.  The Duties Plaintiff Seeks to Enforce Are Non-Discretionary and Apply to DEP

DEP argues that the duties that plaintiff seeks to enforce in Counts 4, 5 and 7 are discretionary rather than mandatory, or apply to mine operators rather than DEP, and therefore are outside the purview of Section 1270(a)(2).  DEP Mem. 8-10.  However, those Counts do allege a justiciable failure by DEP to perform its own mandatory duties.

Count 4 alleges that DEP has a nondiscretionary duty under 30 C.F.R. § 733.11, which provides that states with federally-approved programs under SMCRA "shall implement, administer, enforce and maintain it in accordance with the Act, this chapter and the provisions of the approved State program" (emphasis added).  The use of the term "shall" normally signifies a mandatory duty.  Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach, 523 U.S. 26, 35 (1998); Save the Valley v. EPA, 99 F. Supp.2d 981, 984 (S.D. Ind. 2000).  Count IV alleges that DEP is violating this mandatory duty, because it is continuing to issue bonds under an alternative bonding system that OSM has found to be in violation of the requirements of SMCRA.

Count 5 alleges that DEP has a nondiscretionary duty under 30 U.S.C. § 1260(b)(1) and (b)(2), which provide that "no permit . . . application shall be approved unless . . . all requirements of . . . this Act and the State . . . program have been complied with" and "the applicant has demonstrated that reclamation as required by this Act and the State . . . program can be accomplished" (emphasis added).  Section 1259(a) provides that "the amount of the bond shall be sufficient to assure the completion of the reclamation plan if the work had to be performed by the regulatory authority in the event of forfeiture . . . ." (emphasis added).[7]  Again, the use of the

_____

[7]While DEP argues that 1259(a) only applies to mine operators, not DEP, the plain language of that section contains no such limitation.  DEP Mem. 8.  Even if it did, 1260(b) prohibits DEP from approving a mining application that fails to comply with other provisions of

term shall in these provisions signifies a mandatory duty.  Count 5 alleges that DEP has violated this mandatory duty, because OSM has found that DEP's alternative bonding system fails to meet the objectives and purposes of SMCRA, that is, it fails to meet minimum federal criteria.

DEP argues that these claims only relate to the exercise of DEP's discretion, and can only be challenged by attacking individual permit decisions.  DEP Mem. 10-11.  However, Plaintiff is not attacking individual permit decisions where DEP's discretion is applied.  Rather, Plaintiff's claims are all focused on DEP's <u>systemic</u> failures.  In 1995, OSM found that "the West Virginia alternative bonding system no longer meets the requirements of 30 C.F.R. 800.11(e)" and "is not achieving the objectives and purposes of the conventional bonding program set forth in section [1259] since the amount of bond and other guarantees under the West Virginia program are not sufficient to assure the completion of reclamation."  60 Fed. Reg. 51900, 51910 (Oct. 4, 1995).  Complaint, ¶s 19, 87.  As a result, DEP's individual decisions can not comply with SMCRA, regardless of how DEP's discretion is applied.  DEP's alternative bonding system is structured so that it will necessarily lead to inadequate bonds and reclamation, because it is inconsistent with minimum and mandatory federal standards under SMCRA.

Count 7 alleges that DEP has a nondiscretionary duty under 30 C.F.R. § 732.17(f)(1), which provides that:

> If [OSM] determines that a State program amendment is required, the State regulatory authority [here, DEP] <u>shall</u>, within 60 days after notification of that decision, submit to [OSM] either a proposed written amendment or a description of an amendment to be proposed that meets the requirements of the Act and this chapter, and a timetable for enactment which is consistent with established administrative or legislative procedures in the State. [emphasis added]

---

SMCRA, including 1259(a), and therefore makes that section enforceable against DEP.

Again, the word "shall" signifies that this is a mandatory duty.  Count 7 alleges that DEP violated

this duty by failing to submit numerous program amendments required by OSM within the 60-day

deadline.   Section 732.17(f)(1) contains the classic form of a "clear-cut" non-discretionary duty,

because it requires a specific action within a specified period of time.  The cases cited by DEP so

hold.  See, e.g., Sierra Club v. Thomas, 828 F.2d 783, 790-91 (D.C. Cir. 1987)("readily

ascertainable" and "date-certain" deadlines are "clear-cut" nondiscretionary duties).  Thus, all of

the duties that Plaintiff seeks to enforce are non-discretionary and apply to DEP.[8]

### IV.   Section 1270(a)(1) Provides Jurisdiction Over Count 6

Section 1270(a)(1) of SMCRA authorizes any person to commence a civil action against

any governmental instrumentality which is alleged to be in violation of the provisions of SMCRA

or of any rule or regulation issued pursuant thereto.  Count 6 alleges that DEP violated a

regulation under SMCRA, namely 30 C.F.R. § 732.17(f)(1), by failing to submit required program

amendments within required 60-day deadlines.  Count 6 therefore falls within the plain language

of the statute.  However, Count 6 is duplicative of Count 7, which is based on the alternative

citizen suit provision in 1270(a)(2).  The legislative history cited by DEP (Mem. 12) supports the

principle that "subsection (a)" of section 1270 authorize citizen suits against a state regulatory

authority "to enforce the Act" and where it "has failed to properly implement the Act."

Oklahoma Wildlife Federation v. Hodel, 642 F. Supp. 569, 572 (N.D. Okl. 1986)(quoting 121

Cong. Rec. S6176 (1975) and S. Rep. No. 101, 94th Cong., 1st Sess. 84 (1975)).  The legislative

---

[8]DEP also argues that Plaintiff's only remedy for its failure to comply with a
nondiscretionary duty is to ask OSM to revoke the state program.  DEP Mem. 10, 14.  That
argument is directly inconsistent with the plain language of 1270(a)(2), and would nullify the
Congressional authorization for citizens to sue a "state regulatory authority."

history does not expressly distinguish between (a)(1) and (a)(2) suits, and refers only to subsection (a).  Nonetheless, regardless of whether Count 6 falls within the scope of both 1270(a)(1) or (a)(2), it certainly falls within the scope of one of them, because it seeks to enforce the Act and alleges that DEP has failed to properly implement it.  This Court therefore has jurisdiction over that Count.

### V.  Plaintiff's Requested Relief Is Not Barred by the Tenth Amendment

DEP argues that Plaintiff, in its requests for relief, is asking this Court to "impose federal standards on the State and order specific legislation to be adopted to implement those federal standards" in violation of the Tenth Amendment to the U. S. Constitution.  DEP Mem. 12.  This is erroneous.  Plaintiff is not asking this Court to impose federal standards or compel the state to enact specific legislation to implement those standards.  Instead, Plaintiff is merely seeking to enforce the minimum federal standards in SMCRA that DEP <u>chose</u> to follow twenty years ago, when it voluntarily submitted a state mining program for federal approval. Having chosen to implement federal law under SMCRA, including the mandatory duties contained in that statute, DEP cannot now claim that those duties are unenforceable.

The Supreme Court has repeatedly recognized that the Tenth Amendment does not bar federal programs that provide states with the option of choosing to administer and enforce federal standards.  In <u>Hodel</u>, 452 U.S. at 293, the Court held that SMCRA does not violate the Tenth Amendment.  The Court stated that (<u>id</u>. at 288):

> . . . the States are not compelled to enforce . . . standards, to expend any state funds, or to participate in the federal regulatory program in any way whatsoever. If a State does not wish to submit a proposed permanent program that complies with the Act and implementing regulations, the full regulatory burden will be borne by the Federal Government. *Thus there can be no suggestion that the Act commandeers the legislative*

> *processes of the States directly by compelling them to enact and enforce a federal
> regulatory program.* [emphasis added]

Subsequently, in <u>New York v. United States</u>, 505 U.S. 144, 161 (1992), the Court cited <u>Hodel</u> as

a case in which "the Court upheld the Surface Mining Control and Reclamation Act of 1977

precisely because it did not 'commandeer' the States into regulating mining."[9]

     The other cases cited by DEP are inapposite.  None of them holds that the Tenth

Amendment bars citizen enforcement of a state's mandatory duties under a delegated federal

program.  In <u>Petersburg Cellular Partnership v. Board of Supervisors</u>, 205 F.3d 688 (4th Cir.

2000), the case was resolved by *per curiam* opinion, with only one of the three judges finding the

federal statute at issue to violate the Tenth Amendment.  That judge stated that the Tenth

Amendment is not violated where (as here) a federal law induces a state to voluntarily assume the

responsibility to enforce federal standards:

> If Congress desires that the states themselves become involved in a suggested federal
> regulatory scheme, it may employ incentives to encourage states to do so. But it cannot
> coerce
> and unilaterally erase the lines of separation.
>
>                \* \* \*
>
> [The] rigor of this [constitutional] structure does not preclude a non-coercive arrangement
> between federal and state sovereigns encouraged by federal incentives or achieved through
> voluntary cooperation.

205 F.3d at 701, 703.  Similarly, in <u>Maryland v. EPA</u>, 530 F.2d 215 (4th Cir. 1975), *vacated and*

*remanded for consideration of mootness sub nom,* <u>EPA v. Brown</u>, 431 U.S. 99 (1977) *(per*

*curiam)*, the Fourth Circuit refused to interpret the Clean Air Act to allow the EPA "to direct a

state to enact its own statutes and regulations as prescribed by the Administrator of EPA."

---

     [9]Unlike SMCRA, the federal law in question in New York did not allow the state the
option of declining to administer the federal program: "No matter which path the State chooses, it
must follow the direction of Congress."  505 U.S. at 177.

However, the court did not question the validity of statutes "which invite state regulation or administration in lieu of federal control."  530 F.2d at 228.

DEP argues that, like EPA in Maryland v. EPA, Plaintiff seeks to "compel a state to implement federal regulations and pass legislation that adopts federal standards."  DEP Mem. 15. DEP does not directly attack SMCRA's cooperative federalism scheme, for to do so would obviously run counter to Hodel and New York.  Rather, DEP asserts that if WVDEP is not meeting minimum federal bonding standards, "the only constitutionally permissible remedy is for the OSM to promulgate a plan for Director Castle and the WVDEP to consider implementing, or to take over the West Virginia surface mining program . . . ."  Id. at 15-16.

These arguments mischaracterize the relief requested by Plaintiff.  Plaintiff seeks a declaratory judgment regarding the Director's failure to perform nondiscretionary duties and an order which would require the Director to (1) administer the state regulatory program in accord with SMCRA and the approved state program, (2) submit required state program amendments as set forth by OSM at 30 C.F.R. § 948.16 and § 732, that will assure that the state bonding program achieves the objectives and purposes of the SMCRA, and (3) withhold approval of permits until the bonding provisions of SMCRA and the approved state program are met.  See, Complaint, ¶¶ K, L, M, and N.  This relief would not compel or commandeer the State to do anything that would contravene the Tenth Amendment.  It would only require DEP to perform the nondiscretionary duties that it voluntarily assumed under the approved state program.  If West Virginia wishes to continue to administer the state regulatory program, it may not use the Tenth

Amendment to renege on its voluntary pledge to perform such nondiscretionary duties.[10]

Michigan Bell Telephone Co. v. Climax Telephone Co., 202 F.3d 862, 868 (6th Cir. 2000) is instructive.  State Commissioners arbitrated and approved an interconnection agreement between Ameritech and Climax pursuant to the federal Telecommunications Act of 1996. Ameritech sought equitable relief in federal court against the Commissioners alleging, *inter alia*, that the agreement violated federal law.  The Commissioners raised the Tenth Amendment as a defense.  The court held:

> The Commissioners' Tenth Amendment argument is also unavailing.   The Commissioners argue that the doctrine of New York v. United States, and Printz v. United States, prohibits Ameritech's suit as a "commandeering" of state resources.   Michigan chose to regulate interconnection agreements under the Act. It could have chosen not to participate, in which case it would not have arbitrated and reviewed the agreement between Ameritech and Climax.  Michigan did, in fact, arbitrate and review the agreement, precisely the action complained of. The state cannot have it both ways.   The United States did not compel its actions and, consequently, the Tenth Amendment does not bar Ameritech's suit.  (Citations omitted).

Likewise, West Virginia cannot "have it both ways."  If a state voluntarily assumes the responsibilities and benefits of enforcing a federal regulatory statute, it may not subsequently violate its mandatory duties to enforce federal standards under that statute.[11]

Furthermore, DEP's argument is, in effect, a challenge to the constitutionality of the

---

[10]If DEP no longer wishes to perform these nondiscretionary duties under SMCRA, it may inform this Court of this choice.  Plaintiff's claims against DEP would then be moot, and OSM would have a mandatory duty under SMCRA to institute a federal regulatory program for West Virginia.

[11]In effect, DEP's argument is that, although Congress can require the federal government to initially review a state mining program for consistency with minimum federal standards when it is first submitted for approval, the Tenth Amendment bars Congress from authorizing the federal courts from enforcing that program if the state later deviates from it.  If DEP could obtain power without accountability in this manner, it would eviscerate minimum federal standards.

citizen suit provision of SMCRA.  That right is an integral part of SMCRA, and is not barred by the Tenth Amendment, because it is necessary to compel compliance with federal standards to which the State chose to bind itself under SMCRA.  See, In re Permanent Surface Mining Regulation Litigation, 653 F.2d 514, 519 (D.C. Cir. 1981) ("The Secretary's oversight function is shared in part by the public which is given the right to sue in federal court, to compel compliance with the state program . . . .").

The relief requested by Plaintiff is authorized by SMCRA and is within this Court's traditional equitable powers.  Section 1270(a) authorizes this Court "to compel compliance with this Act."  Section 1270(d) specifically refers to the availability of "a temporary restraining order or preliminary injunction."  These provisions place no restrictions on the Court's equitable powers.  The Supreme Court has held that, in these circumstances, where Congress has entrusted the enforcement of statutory prohibitions to an equity court, the court may invoke the full range of equitable remedies necessary "to provide complete relief in light of the statutory provisions." Mitchell v. Robert DeMario Jewelry, Inc., 361 U.S. 288, 291-292 (1960); Porter v. Warner Holding Co., 328 U.S. 395, 397-398 (1946).

In sum, the Tenth Amendment does not bar Plaintiff's action because Plaintiff is not seeking to compel DEP to enact a federal regulatory program; DEP has already chosen to do that. Rather, this is simply a citizen suit to enforce compliance with federal standards under DEP's voluntarily-assumed state regulatory program.

## VI.  Plaintiff Has Standing

DEP argues that Plaintiff lacks standing because the complaint does not identify an adversely affected organizational member.  DEP Mem. 17-18.  However, "at the pleading stage,

15

general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" Bennett v. Spear, 520 U.S. 154, 167-168 (1997).  Since DEP concedes that Plaintiff has generally alleged that its individual members have been harmed by DEP's alleged violations (DEP Mem. 16-17), Plaintiff's complaint adequately alleges standing.

In any event, Plaintiff is submitting affidavits from three of its members.  Exhibits 2, 3, 4. On a motion to dismiss, the court can consider the allegations of the complaint and accompanying affidavits.  Warth v. Seldin, 422 U.S. 490, 501 (1975).  Those affidavits demonstrate that these members have suffered harm to their aesthetic, environmental, and economic interests as a result of DEP's failure to cure the deficiencies in its alternative bonding system.  Whenever a mine operator fails to fully reclaim a mine site and forfeits a bond that can not pay the full costs of reclamation, it increases the risk of unsightly scars on West Virginia's terrain, and discharges of untreated, contaminated water into its streams. That risk applies both to inoperative mines where defaults have already occurred, and still-operative mines where defaults may occur in the future. Plaintiff's members enjoy viewing the terrain near these mines and recreate near the streams that adjoin them.  As a result, any risk of bond forfeiture in excess of minimum federal standards harms their aesthetic, economic and recreational interests.  Plaintiff's members have therefore suffered a cognizable injury in fact.  Alaska Center for the Environment v. Browner, 20 F.3d 981, 984-86 (9th Cir. 1994)(plaintiffs have standing to protect water quality threatened by EPA's failure to perform a mandatory duty under the Clean Water Act); Sierra Club v. Browner, 843 F.

Supp. 1304, 1309-11 (D. Minn. 1993)(same).[12]

DEP also argues that Plaintiff's complaint does not adequately allege that DEP's alleged

violations have caused environmental harm.  DEP Mem. 18.  However, in enacting SMCRA,

Congress made a finding that inadequate bonding causes environmental disturbance and harm to

citizens:

> [T]here are a substantial number of acres of land throughout major regions of the United
> States disturbed by surface and underground coal [mining operations] on which little or no
> reclamation was conducted, and the impacts from these unreclaimed lands impose social
> and economic costs on residents in nearby and adjoining areas as well as continuing to
> impair environmental quality.

30 U.S.C. § 1201(h).  The purpose of a bond is "to assure completion of the reclamation plan"

and to prevent this harm.  Id., § 1259(a).  The purpose of citizen suits is to assure that state

regulators comply with their nondiscretionary duties under SMCRA, including their duty to

refrain from approving permits unless "the applicant has demonstrated that reclamation as

required by this Act and the State or Federal program can be accomplished."  Id., §§ 1270(a)(2),

1260(b)(2).  Consequently, Congress has already determined that there is a direct causal

relationship between an inadequate state bonding program and environmental harm.  Cf., Alaska

Center for the Environment v. Browner, 20 F.3d at 985 (Congressional determination that

---

[12]Plaintiff also has standing to enforce DEP's mandatory duties concerning the other
required program amendments that it has failed to submit.  Those amendments relate to required
components of SMCRA's statutory scheme to protect surface lands and waters that are used by
Plaintiff's members and that are adversely affected by surface mining activities.  DEP has failed to
comply with multiple OSM demands to correct deficiencies in its program, including inadequate
standards for blasting, revegetation of mine sites, protection of water quality and water supplies,
land subsidence, and reclamation.  The affidavits of Plaintiff's members demonstrate that they
have aesthetic and environmental interests in the quality of the land and water near mining sites
affected by these requirements, and therefore have standing to enforce them.

statutory tools improve environmental quality is proper basis for finding causal connection for standing to enforce those tools).

Furthermore, Plaintiff's complaint specifically alleges that the insufficient funds available under DEP's alternative bonding system currently causes ongoing degradation of land and waters used and observed by WVHC members.  Complaint, ¶s 33-45.[13]  The purpose of bonding is to ensure adequate funding to complete full reclamation if a permitted mine site is abandoned and the state regulatory agency is called upon to reclaim it.  OSM has found that West Virginia's alternative bonding program does not generate adequate funds to reclaim all mine sites, and that its reclamation fund is insolvent.  Id.  As a result, many abandoned post-SMCRA mine sites have remained unreclaimed, and those sites generate acid mine drainage that pollutes nearby streams.  Id.

DEP also argues Plaintiff's complaint does not adequately allege that correcting the alleged deficiencies in DEP's bonding program and state program will redress the injuries suffered by Plaintiff's members.  DEP Mem. 18-19.  If Plaintiff's requested relief is granted, DEP or OSM will be forced to implement a bonding program capable of providing adequate monies to fully reclaim all post-SMCRA abandoned mines.  That will redress Plaintiff's injuries.  Contrary to DEP's argument, the redressability element of standing does not require Plaintiff to show how additional bond funding will "cause [DEP] to change any prospective, discretionary decisions with respect to reclamation of abandoned mine lands or permits."  DEP Mem. 18.  Animal Legal Defense Fund v. Glickman, 154 F.3d 426, 443-44 (D.C. Cir. 1998)(rejecting "the possible

---

[13]Plaintiff need not allege or prove actual environmental harm to demonstrate standing.  Ecological Rights Foundation v. Pacific Lumber Co., 230 F.3d 1141, 1151-52 (9th Cir. 2000).

counterargument that the redressability element . . . requires a plaintiff to establish that the
defendant agency will actually enforce any new binding regulations against the regulated third
party"). Plaintiff therefore has standing to sue.

### VII.  Plaintiff's Claims Against DEP Are Ripe

DEP argues that Plaintiff's claims are not ripe, because Plaintiff has not alleged that any
particular permit is inadequate with respect to bonding.  DEP Mem. 19-20.  However, Plaintiff's
claims against DEP all raise purely legal issues concerning whether DEP has failed to perform
nondiscretionary duties under federal law.  Plaintiff need not wait until DEP issues another flawed
permit with an inadequate bond.  Citizens suits for failure to perform nondiscretionary duties may
be filed before an agency takes final agency action. Commonwealth of Virginia v. EPA, 74 F.3d
517, 524 (4th Cir. 1996)(citing City of Seabrook v. Costle, 659 F.2d 1371, 1373 (5th Cir. 1981);
Sierra Club v. Browner, 843 F. Supp. at 1311.  For example, in Powder River Basin Resource
Council v. Babbitt, 54 F.3d 1477, 1483-84 (10th Cir. 1995), the court held that a citizen suit
against state officials under SMCRA was ripe, because the case presented the purely legal issue of
whether Wyoming had "violated federal law by refusing to satisfy the requirements of its
conditional approval" under SMCRA.  Similarly, the instant case raises the purely legal issue of
whether DEP has violated federal law by refusing to fix its alternative bonding system, and other
parts of the state program, as OSM has directed.

Although OSM directed DEP to reform its alternative bonding system to comply with
federal law in 1990, DEP has delayed taking corrective actions to fix that system for over nine
years.  "At some point administrative delay amounts to a refusal to act, with sufficient finality and
ripeness to permit judicial review." Public Citizen Health Research Group v. FDA, 740 F.2d 21,

32 (D.C. Cir. 1984).  That point has been reached in this case.  "When agency recalcitrance is in the face of a clear statutory duty or is of such magnitude that it amounts to an abdication of statutory responsibility, the court has the power to order the agency to act to carry out its substantive statutory mandates."  Id.

Plaintiff would suffer hardship if court action were further delayed.  DEP's delay has already created an enormous deficit in the bond fund which prevents the timely cleanup of abandoned mine sites.  Every additional day of delay in cleaning up those sites harms the aesthetic and environmental interests of Plaintiff's members.  Plaintiff's claims against DEP are therefore ripe for review.

### Conclusion

For these reasons, DEP's motion to dismiss should be denied.

Respectfully submitted,

JOSEPH M. LOVETT
PATRICK C. McGINLEY
SUZANNE M. WEISE
JAMES M. HECKER

Counsel for Plaintiffs

BY:   JOSEPH M. LOVETT
P.O. Box 11327
Charleston, West Virginia  25339
(304) 342-0022

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

**THE WEST VIRGINIA HIGHLANDS
CONSERVANCY,**

        Plaintiff,

v.                                        **Civil Action No.** 2:00-CV-1062

**BRUCE BABBITT,** Secretary of the Department of the
Interior, **KATHERINE HENRY,** Acting Director,
Office of Surface Mining and **MICHAEL CASTLE,**
Director, West Virginia Division of Environmental Protection,

        Defendants.

## AFFIDAVIT OF CINDY RANK

I, Cindy Rank, affirm and state as follows:

1.      I have been a member of the West Virginia Highlands Conservancy (WVHC) since 1979. I serve as chair of the Mining Committee of the WVHC. I was president of the WVHC from October 1988 to 1994. I currently serve on the Board as the Organizational Director for FOLK (Friends of the Little Kanawha).

2.      The WVHC is a nonprofit, statewide membership organization incorporated under the laws of the state of West Virginia. It is one of the largest and oldest nonprofit conservation organizations in the state. According to its by-laws, its purposes are to promote, encourage and work for conservation, including both preservation and wise use, and appreciation of the natural resources of West Virginia and the nation, and especially of the Highlands Region of West Virginia, for the cultural, social, educational, physical, health, spiritual and economic benefit of present and future generations of West Virginians and Americans. It has over 900 individual and organizational members.

3.      The WVHC publishes a monthly newsletter and maintains an active conservation-education program. It holds weekend informational meetings in the spring and fall, which are open to the public and which focus on environmental issues, especially water quality, land use, as well as mining and reclamation. The WVHC is a leading source of information about environmental issues in West Virginia. I and other members frequently comment on administrative rules and testify before public bodies concerning clean water and mining issues.

1

4.     The WVHC and its members are particularly concerned about the protection of human and other natural resources during and after coal mining activities. I am one of many members of the WVHC who visit, live near, drive by and/or fly over areas of the state that are visibly affected by surface mining activities, including active, forfeited and abandoned sites. I and other members are aesthetically offended to see unreclaimed mines which were permitted by DEP under the requirements of the federal Surface Mine Control and Reclamation Act (SMCRA) and the West Virginia Surface Coal Mining and Reclamation Act (WVSCMRA).

5.     I have and will continue to frequently travel to coal mining areas in northern, central and southern West Virginia. I enjoy the natural beauty of the State's fields, forests, mountains and streams. I have frequently traveled by and observed the Coal River, Cheat River, the Monongahela River, the Tygart River, Middle Fork, and the Buckhannon River along which are located post-SMCRA active, inactive and bond forfeited mine sites. During my frequent travels in the State, I have observed the adverse impacts of unreclaimed post-SMCRA mine sites, including but not limited to soil erosion, stream sedimentation, and acid and other toxic mine drainage. Moreover, if bonds posted for many of the permitted active and inactive mines I have observed in my travels are forfeited, there are not adequate funds available from those bonds and the Special Reclamation Fund (SRF) to fully reclaim and/or treat AMD at such mine sites.

6.     I have participated in many state and industry-sponsored mine tours over the past 20 years, including visits to many unreclaimed post-SMCRA mine sites in northern West Virginia from which untreated acid mine drainage is discharged. I am deeply disturbed by the adverse impacts to streams caused by the acid mine drainage I have observed flowing from these sites. I am aesthetically offended that acid and metals continue to flow from sites where bond monies have been insufficient to treat the problems at sites that were active then abandoned since the passing of SMCRA in 1977.

7.     I have also participated in many state and industry-sponsored tours over the past ten years to multiple-seam and mountaintop removal sites especially in the southern part of the state. I am deeply disturbed by the permanent loss of streams and forests in those areas, and by the extreme impacts to the nearby communities from blasting, noise and displacement of people. My aesthetic interests and enjoyment of nature in those areas has been substantially diminished and will be permanently diminished if those areas are not fully reclaimed pursuant to the requirement of law if any of the companies operating such mines were to forfeit their bonds and rely on the state to complete reclamation with monies from the insufficient bonds and SRF proceeds.

8.     I work in Rock Cave, WV in southern Upshur County. Water from the

2

Buckhannon River is now piped to many homes and my place of business in Banks District. Treatment costs from cleaning the Buckhannon are passed on to us as users. Treatment costs to the Buckhannon Water Plant have increased since the mid 1980's when mines upstream began to contribute additional amounts of acid and metals. Treatment cost at the forfeited DLM mine is nearly ½ million dollars a year. Cost of treatment at the Island Creek (now Anker WV) complex has been a million dollars a year. Bonding at these and other sites on the Buckhannon is not sufficient to maintain current levels of treatment for any extended amount of time, and yet communities such as Rock Cave will bear the cost of treatment if the present operators forfeit without reclamation and/or without making financial provision for ongoing AMD treatment.

9.      As a member of the WVHC and FOLK, I am deeply concerned about the discharge of Buckhannon River water into the Little Kanawha River. Viewing pristine areas of the State such as the Little Kanawha is emotionally and spiritually satisfying to me and is an important part of the quality of my life. I enjoy hiking along and wading in the Little Kanawha throughout the entire year. A high quality stream, the Little Kanawha and its tributaries are now being affected by the post-SMCRA mines on the Buckhannon River. Sufficient bonding at those sites is essential to the water quality of the Little Kanawha and to my continued recreation and enjoyment of the area.

10.     I have in the past and plan in the future to visit acquaintances who reside along Ten Mile Creek in Upshur County. This once beautiful area is marred by orange-stained holding treatment ponds. The once high quality trout stream is now stained orange and devoid of the naturally reproducing trout I observed in the early 1980's. ANKER WV must treat toxic mine drainage from this property in perpetuity. This toxic mine drainage could not be treated in perpetuity should ANKER WV forfeit its bonds. The orange, black and white seepage from this mined area is aesthetically offensive to me and my enjoyment of the natural beauty of this area has been substantially diminished.

11.     I have in the past and plan in the future to visit acquaintances who reside along the Guyses Run stream in Marion County, West Virginia. This once beautiful area near my friends' homes is marred by an unreclaimed treatment plant with orange-stained holding ponds owned by Martinka Coal Company. The Guyses Run stream has been polluted and subsided by Martinka Coal Company's operations. On a visit there a few years ago, the Guyses Run streambed was coated with a creamy-colored calcium carbonate from the toxic mine drainage being discharged from the Tygart River mine. Subsidence to Guyses Run stream caused by Martinka's mining operations has now caused the natural flow of water in Guyses Run to cease. It has left the Guyses Run streambed dry with pieces of calcium carbonate still remaining in parts of the stream. Martinka must treat the toxic

3

mine drainage flowing from its mine in perpetuity and it now discharges that mine drainage into another tributary which also flows into the Tygart River. This mine could not be reclaimed nor its toxic mine drainage be treated in perpetuity pursuant to the requirement of law should Martinka Coal Company forfeit its bonds. The unreclaimed treatment plant is aesthetically offensive to me and my enjoyment of the natural beauty of this area and Guyses Run has been substantially diminished.

12.    As a resident and user of the Little Kanawha River, I participated in the Environmental Impact Statement (EIS) conducted by the U.S. Environmental Protection Agency in the early 1980's in response to mine permit applications that promised us 50 years of mining in our communities. The headwaters of the Little Kanawha are as acid prone as the Buckhannon River and mining threatened to devastate our streams and diminish our property values. One conclusions of the EIS was that long-term reclamation bonds should be posted by permittees which would guarantee post-mining water treatment if acid mine drainage was created.

13.    I was a member of the Governor's Stream Restoration Committee from 1990 to 1995. The charge of the committee was to evaluate the list of forfeited mine sites where water problems due to mining existed and to decide the best use of the limited monies available in the Stream Restoration Fund. The State had decided to use mitigation money because the bond pool (Special Reclamation Fund) was insufficient to treat all the problems that existed at forfeited mine sites. It continues to offend me that others are asked to pay for problems created by companies who should have been held responsible.

14.    I and other members of the WVHC have volunteered years of times and effort at great personal expense (physical, mental, monetary, social and spiritual) to ensure that federal and state mining laws are enforced properly so that citizens in our communities and across the state are not forced to bear the brunt of destruction caused by mining that is abandoned without leaving sufficient monies to permit the state to complete reclamation. I and other WVHC members are profoundly offended that the bonding requirements of the state program are insufficient to protect us.

15.    The federal SMCRA and the approved West Virginia state program were intended to protect my aesthetic and recreational interests by providing full and complete reclamation of all post-SMCRA permit areas. The inadequacy of West Virginia's alternative bonding program has resulted in direct and ongoing harm to my recreational and aesthetic interests and unless remedied, such harms will continue and increase in magnitude in the future.

FURTHER THIS AFFIANT SAITH NOT.

4

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 23rd day of January, 2001.

_Cindy Rank_
Cindy Rank

_Judith G. Brady_  1/23/01 day.
Sworn before me this day.
My comm. expires  8/14/06.

OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
JUDITH A. BRADY
RT. 1, BOX 20
FRENCH CREEK, WV 26218
My Commission Expires August 14, 2006

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## AT CHARLESTON

**THE WEST VIRGINIA HIGHLANDS
CONSERVANCY,**

        Plaintiff,

v.                                       **Civil Action No.** 2:00-CV-1062

**BRUCE BABBITT,** Secretary of the Department
of the Interior, **KATHERINE HENRY,** Acting Director,
Office of Surface Mining and **MICHAEL CASTLE,**
Director, West Virginia Division of Environmental
Protection,

        Defendants.

### AFFIDAVIT OF WENDY RADCLIFF

I, Wendy Radcliff, affirm and state as follows:

1.      I am a member of the West Virginia Highlands Conservancy and have served on the Board of that organization for many years.  I also previously served as the Environmental Advocate for the West Virginia Division of Environmental Protection (DEP) from July 1994 to July of 1998.

2.      During my tenure at DEP, I led guided tours of active mine sites such as the Dal-Tex Complex in Logan County, Hobet No. 21 in Julian, the Samples mine in eastern Kanawha County, the DLM mine at Alton and the Island Creek mine at Ten Mile in Upshur County.  I was and continue to be aesthetically offended by the adverse affects of those operations on the natural beauty of those areas.  Since leaving my position at DEP, the devastation to the mountains and streams that I observed now deters me from engaging in outdoor activities in the areas disturbed by unreclaimed mines that I have visited.  I spend less time in areas near the unreclaimed mines I have visited and travel there less often than if the areas were less polluted.

3.      I have also flown over the mine sites I mention above.  The adverse impacts of those mining operations on these areas was clearly visible to me from the helicopter, and I found these views to be aesthetically offensive.  In the areas where these operations were being conducted I observed from the helicopter that acres of trees had been removed, the tops of mountains had been removed and

valleys where streams had once flowed were filled with mine spoil. My visits to these areas has become substantially less enjoyable as a result of the environmental degradation present there. Indeed, the frequency of my visits to this area has significantly decreased  because of the environmental damage which has occurred. My aesthetic interests in restoring the natural beauty to these areas will be injured if the environmental degradation there remains and there is insufficient money in the alternative bonding program to reclaim the areas in the event the bonds are forfeited.

4.      I have and will continue to travel through northern, southern and central West Virginia. I enjoy the beauty of the mountains, forests, rivers and streams of our State and I enjoy hiking, canoeing and other recreational activities. For example, I enjoy hiking in Valley Falls and Prickett's Fort along the Tygart Valley River in Marion County. I plan to continue to recreate in those areas in the future.

5.      My aesthetic and recreational interests in this area are adversely impacted by the discharge of toxic mine drainage into tributaries which ultimately flow into the Tygart Valley River. For example, I am particularly concerned about the insufficiency of bond money available to reclaim and treat toxic mine drainage from Martinka Coal Company's Tygart River mine in Marion County, West Virginia, should that inactive mine be abandoned without reclamation. Treated discharges from the Tygart River mine are currently being discharged into the Tygart Valley River. Untreated toxic mine drainage is also flowing from the Tygart Valley River mine into tributaries that ultimately feed into the Tygart Valley River. This toxic mine drainage requires perpetual treatment. This mine could not be reclaimed nor its toxic mine drainage be treated in perpetuity pursuant to the requirement of law should Martinka Coal Company forfeit its bonds. The discharge of toxic mine drainage into the Tygart Valley River from the Martinka mine diminishes my aesthetic interests and enjoyment of recreating along the Tygart Valley River and deters me from swimming in that river near the discharge sites.

6.      The federal SMCRA and the approved West Virginia state program were intended to protect my aesthetic and recreational interests in the full and complete reclamation of all post-SMCRA permit areas. The reclamation of post-SMCRA mountaintop removal sites in southern West Virginia and the cleanup of toxic mine drainage from post-SMCRA mine sites in northern and central West Virginia is dependent upon the fiscal soundness and adequacy of West Virginia's alternative bonding program and the SRF.


FURTHER THIS AFFIANT SAITH NOT.

_____

**WENDY RADCLIFF**


Sworn and subscribed before me this 19th of January, 2001.

_____

Notary Public


County of _Kanawha_ , State of West Virginia.

My Commission Expires: _May 21, 2007_ .

OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
BROOKE MICHELE LANHAM
280 MATHEWS AVE.
CHARLESTON, WV 25302
My Commission Expires May 21, 2007

### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
### AT CHARLESTON

THE WEST VIRGINIA HIGHLANDS
CONSERVANCY,

        Plaintiff,

v.                                                          Civil Action No. 2:00-CV-1062

BRUCE BABBITT, Secretary of the Department
of the Interior, KATHERINE HENRY, Acting Director,
Office of Surface Mining and MICHAEL CASTLE,
Director, West Virginia Division of Environmental
Protection,

        Defendants.

### AFFIDAVIT OF CRAIG MAINS

I, Craig Mains, affirm and state as follows:

1. I live at 137 Hoffman Avenue, Morgantown, West Virginia.

2. I am and for many years have been a member of the West Virginia Highlands
Conservancy. I also serve on the steering committee and technical committee of
the River of Promise Task Force.

3. I have and will continue to frequently travel throughout the coal mining areas of
northern West Virginia, particularly the areas of Preston and Monongalia
Counties. I enjoy the natural beauty of Preston and Monongalia Counties
including their mountains, forests, rivers and streams. I enjoy engaging in
outdoor activities along West Virginia's streams such as hiking and nature
observation. As a hobby and also as part of my desire to protect West Virginia's
natural beauty, I have developed an interest in stream quality and preservation.

4. My interest in stream quality in West Virginia goes back at least twenty years. As
an outdoorsman, I have spent many hours hiking along West Virginia streams. I
was greatly disappointed to discover first hand how many miles of streams in
northern West Virginia had been rendered practically sterile by acid mine
drainage. I believe that many of the affected streams had probably historically
been native brook trout streams.

5.   Over the past ten years, I have become increasingly interested in stream quality.
     As a volunteer with Downstream Alliance, I coordinated a project from 1994 to
     1996 to map stream quality in Preston County, in which over 40 volunteers and I
     collected invertebrate aquatic samples at over 330 sites. From 1998 through 2000,
     I coordinated a similar project in Monongalia County, collecting samples at over
     250 sites. The objective of both of these projects was to map stream quality, to
     determine the extent of AMD-polluted stream segments, and to locate any
     remaining high quality streams that could be targeted for protection.

6.   These stream monitoring projects have brought me in contact with three sites
     where inadequate bonding has failed to protect downstream water resources and
     failed to pay for the cost of post-forfeiture water quality treatment.

7.   In April of 1994, a seal blew out at T&T Coal Company's No. 2 mine in Preston
     County, leaving acid mine water pouring from an old mine where T&T had
     pumped it to avoid treatment. The water flowing from Muddy Creek into the
     Cheat River was orange and has adversely impacted the organisms in the stream.
     The AMD has also turned rocks in Cheat canyon downstream from Muddy Creek
     orange. My aesthetic interests and recreational enjoyment of this area have been
     severely diminished as a result of the flow of this toxic mine drainage into Muddy
     Creek and the Cheat River. The T&T site drains into a segment of Muddy Creek
     that had already been polluted by AMD and contributes additional acid and iron to
     the Cheat River, thereby causing further significant pollution of that river. It is
     my understanding that treatment costs at the T&T site use a large percentage of
     Special Reclamation Fund's (SRF) annual budget to the extent that some other
     bond forfeiture sites go without water quality treatment. If sufficient funds are not
     available in the SRF and it is not fiscally sound, the flow of AMD from the mine
     into Muddy Creek and the Cheat River will not be cleaned up, thereby allowing
     the continued polluting and devastation of one of the State's most beautiful and
     recreated rivers.

8.   Another example of AMD that I have observed and continue to monitor involves
     the F&M mine site at the headwaters of the left fork of Sandy Creek in Preston
     County near Fellowsville. The treatment costs at the F&M site have also
     exceeded the forfeited bonds. AMD is now being treated with the financial
     assistance of the local watershed group, although it has not been able to restore the
     stream, which was the home to numerous fish and native bivalves, to the same
     quality it had before mining occurred.

9.   Another example involves the Omega mine in Monongalia County. The Omega
     mine caused severe pollution damage to a section of Owl Creek that had
     previously been healthy. DEP is now required to operate an expensive treatment
     project at this site, but has failed to restore Owl Creek to its former condition.

10.  The quality of the streams that I have enjoyed hiking along are not being protected

by West Virginia's current alternative bonding program. In all of the cases I mention above, West Virginia's current bonding program has failed to protect downstream water resources and has not covered the cost of post-forfeiture water treatment.

11.    The federal SMCRA and the approved West Virginia state program were intended to protect my aesthetic and recreational interests in the full and complete reclamation of all post-SMCRA permit areas. The cleanup of AMD flowing into Muddy Creek and the Cheat River in Preston County and other post-SMCRA mine sites in northern West Virginia is dependent upon the fiscal soundness and adequacy of West Virginia's alternative bonding program and the SRF. My recreational enjoyment of and aesthetic interests in the natural beauty and water quality of the streams in these areas have been severely diminished as a result of AMD and the inadequacy of West Virginia's alternative bonding program.

FURTHER THIS AFFIANT SAITH NOT.


_____
CRAIG MAINS

OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
LESLIE G. MARCHIO
2037  11th Avenue
Morgantown, WV 26505
My Commission Expires November 12, 2009

Sworn and subscribed before me this 30th of January, 2001.


_____
Notary Public

County of Monongalia , State of West Virginia.

My Commission Expires: Nov - 12, 2009 .

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### AT CHARLESTON

**THE WEST VIRGINIA HIGHLANDS CONSERVANCY,**

      **Plaintiff,**

**v.**                                          **CIVIL ACTION NO. 2:00-1062**

**BRUCE BABBITT, <u>et al.</u>,**

      **Defendants.**

## <u>CERTIFICATE OF SERVICE</u>

I, Joseph M. Lovett, do hereby certify that I have provided true and exact copies of the foregoing **"PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT CASTLE'S MOTION TO DISMISS"** upon counsel of record by U.S. Mail in a postage prepaid envelope or by hand delivery on this 30th day of January, 2001, addressed as follows:

Ruth Ann Storey
Environmental and Natural Resources Division
General Litigation Section
P.O. Box 663
Washington, DC 20044-0663

Benjamin Bailey
Bailey & Glasser
227 Capitol St.
Charleston, West Virginia 25301

Michael Keller
Assistant United States Attorney
P.O. Box 1713
Charleston, West Virginia 25326

_____
Joseph M. Lovett